# 𝔚𝔶𝔱𝔥𝔢𝔳𝔦𝔩𝔩𝔢.

## KEFFER AND WIFE V. GRAYSON.

### July 20, 1882.

1. CONTRACTS—*When time is of the essence.*—Where under contract a right has passed, and purchaser takes possession and makes improvements, that right will not be divested by failure to do the act at the appointed time. But where no right is acquired until the doing of some act by the purchaser stipulated to be done, the performance of the act is a condition precedent, and *time becomes of the essence.*

2. IDEM—*Idem—General .rule.*—In unilateral contracts, time is of the essence, to be modified by peculiar circumstances, accounting for delay, and showing party in default still entitled to relief.

3. IDEM—*Consideration.*—" Love and affection " is not enough of itself to warrant a decree for specific performance. .

4. IDEM—*Idem—Nudum pactum.*—A promise to pay a debt for which the promisor is already bound, is mere *nudum pactum*, and adds nought to the original obligation.

5. CASE AT BAR.—G rented land to son-in-law at annual rent, for a term of years. Before close of term, he in·writing promised son-in-law that if, *by a certain specified time*, he would pay G rent already in arrear, and rent to accrue at end of term, and other amounts owing him, he, G, would in consideration of the love and affection he bore his daughter, convey the land in fee to her for separate use. Son-in-law made the payments to G, but not *by the time specified in the agreement.* G's circumstances having changed, he refused to convey the land to his daughter. On bill filed by son-in-law and wife against G for specific performance—

HELD:

    1. Payment by son-in-law, *within the time specified,* was a condition precedent to his acquiring right to specific execution·of the contract.

    2. Payment *after the time specified* entitled him to no such right.

Appeal from decree of circuit court of Smyth county, in suit of William H. Keffer and Henrietta M., his wife, against Franklin Grayson.

Keffer had rented from Grayson, his father-in-law, his "Fowler" farm for five years from 1st January, 1872, at $650 per annum. On 1st September, 1874, they made the following agreement:

"That whereas Franklin Grayson desires to effect a division of his real estate in Smyth county, Virginia, known as the 'Fowler' farm, among his three children, Keffer and wife, Kelley and wife, and Fulkerson and wife, this agreement is made. Now, in consideration of natural love and affection, said Grayson agrees that if W. H. Keffer shall have paid to him the rent of said land for 1875 and 1876, and $108 for past rent, and his other liabilities to said Grayson, *on or before the 1st of January*, 1877, then said Grayson agrees to convey in fee the mountain part of said 'Fowler' farm to Henrietta M. Keffer for her sole use. Otherwise, and in the event that the said Keffer shall fail to comply with his part of this contract, then this contract to be void and of no effect."

Keffer did not pay to Grayson the amounts due him by 1st January, 1877, but on that date made his promissory note to Grayson for $387.47, balance due him, which he did not pay before 17th December, 1877. Grayson's circumstances changed and he declined to convey the land to Mrs. Keffer, who, with her husband, filed their bill for specific performance.

Opinion of court states the remaining facts. Circuit court refused the relief prayed for, and the plaintiffs appealed.

*J. A. Gilmore* and *R. A. Richardson*, for appellants.

*John A. Campbell*, for appellee.

STAPLES, J., delivered the opinion of the court.

The bill alleges that Dr. Keffer, one of the appellants, surrendered the possession of the tract of land held by him under the lease of the 29th September, 1871, in order that the appellee might carry out his expressed intention of dividing the tract among his three daughters, one of whom is the female appellant, the wife of Dr. Keffer. With this understanding the agreement of the 1st September, 1874, was entered into, by which the appellee undertook to convey the land in controversy to the female appellant. Had the truth of these allegations been established by the evidence, there is no doubt, I imagine, but that a court of equity would decree a specific performance. They are, however, positively and plainly denied in the answer, and the only testimony adduced to sustain them is that of Dr. Keffer himself. The agreement of the 1st of September, 1874, states, or professes to state, the consideration upon which the promise to convey is founded. No reference is there made to the surrender of the land held under the lease, nor is it intimated that Dr. Keffer, in making such surrender, was influenced by the promise of the appellee to make the settlement upon his daughter.

To decree a specific performance against the positive denial of the answer upon the unsupported testimony of the opposing party, would be to run counter the plainest rules of equity jurisprudence.

In order, then, to ascertain the real consideration of the promise to convey, we must look to the written agreement. It is there stated to be the natural love and affection which the appellee bears the appellant, Dr. and Mrs. Keffer, and the undertaking of Dr. Keffer to pay the appellee, on or before the 1st of January, 1877, a past rent of $108, the rents to accrue for 1875 and 1876, and all his other liabilities to the appellee. Upon the fulfillment of these terms and conditions the appellee stipulated that he would make the conveyance to his daughter.

It will be seen that this agreement imposed no obligation upon Dr. Keffer.

It was left optionary with him whether he would or would not make the payments. If he made them, his wife was entitled to the conveyance. If he did not, he would continue in possession as lessee at an agreed rent until the 1st January, 1877. The contract was one, therefore, by which only the appellee was bound. But if it be conceded that Dr. Keffer was also bound, still the contract created no additional liabilities, imposed no new obligations upon him. On his part it was simply an undertaking to pay certain rents, for which he was or would be responsible as lessee, and also to pay certain other debts he owed the appellee.

A debt barred by limitation or by a discharge in bankruptcy, may be revived by a new promise, and the new promise may constitute a valid consideration. But a promise to pay a debt for which the promisor is already legally bound is a mere *nudum pactum*, and adds nothing to the force of the previous obligation. No man can make his own wrong in withholding what he justly owes the foundation of a demand against his creditor. It is, therefore, clear that a promise to pay a subsisting indebtedness, or even its actual payment, is not a consideration upon which a court of equity can decree the specific execution of an agreement for the conveyance of real estate. It is impossible to say there is a valuable consideration where the debtor does no more than the law compels him to do, and the creditor receives no more than he is entitled to receive.

If, therefore, Dr. Keffer had discharged all his indebtedness to the appellee by the 1st of January, 1877, such discharge would not of itself have given him any claim to call for a conveyance. He did not, however, as is conceded, comply with his contract in this particular. He did not make the payments on or before the 1st January, 1877. A

reference to the agreement of the 1st September, 1874, will further show that it did not operate as a transfer of any title, legal or equitable, to Mrs. Keffer. It was not a sale of an interest in the premises, but a mere agreement to convey, upon the performance of certain acts by one of the parties, on or before a particular day. Until the performance of these acts Dr. Keffer occupied the position of a tenant paying rent, and not of purchaser or owner of the premises. This compliance with his contract at the appointed time was therefore a condition precedent to the transfer or vesting in him or his wife any interest or estate under the contract.

The authorities draw a distinction between a contract of purchase under which a right has passed and the purchaser has taken possession and made valuable improvements, and a contract under which no title or interest is acquired by the purchaser until the doing of some act by him stipulated to be done.

In the first case a right has vested which will not be defeated by the failure to do the act at the appointed day if compensation can be made in damages. In the other case the performance of the act is a condition precedent to the vesting of any estate and time becomes the essence of the contract. *Wells* v. *Smith,* 31 Am. Decisions, p. 274.

If, said Lord Cranworth, in *Brooke* v. *Garroll,* 3 K. and Jones, 608, the contract be that on the payment of $1,000, at or before a specified day, a certain act shall be done on my part. I am at a loss to see why I can possibly be called on to do the act if the money be not paid at the day, or why I should be compelled to perform not my contract, but another contract into which I have not entered.

In *Kerr* v. *Purdy,* 51 New York, 629, the bill alleged that the defendant leased certain premises to the complainant for the term of five years, with a clause giving the lessee the privilege of purchasing at any time within the first

three years by paying all the arrears of rent and the sum of $10,000.

The plaintiff was in arrears for the rent, and did not pay the purchase money before the time expired, although he had made arrangements to do so.

The court held that the right of the plaintiff to a specific execution depended on payment within three years, and ceased when they elapsed without the fulfillment of the condition. Leading Cases in Equity, vol. 2, part 2, p. 1136; Pomeroy on Contracts, §§ 472, 411, 374. The general rule is, therefore, that in unilateral contracts time is regarded as the essence of the agreement, to be modified or varied, however, by peculiar circumstances which account for the delay and show that notwithstanding the failure to perform, the party in default is still entitled to relief.

It would seem to be very clear that this is not a case constituting an exception to the general rule.

Here the father, in consideration of the love and affection he bears his daughter and her husband, proposes to settle an estate upon the former, subject, however, to the express condition that the husband shall, on or before an appointed day, pay all his indebtedness to the father, and also the accruing rents for the use of the property in the meantime—the condition not being complied with, the obligation to convey is at an end upon the plainest principles of equity and justice. It has been said, however, that the subsequent receipt of the money operated as a waiver of the condition. I do not think so. The appellee was only receiving payment of an existing indebtedness to which he was justly entitled, independently of the contract of purchase.

He must of necessity have received it, unless he intended to relieve his debtor from all liability without payment.

We come then to the main question whether the consideration of love and affection, is sufficient to justify a decree for a specific execution.

This question has not been directly passed upon by this court, although there are *dicta* of learned judges in several reported cases. In *Jones* v. *Obenchain*, 10 Gratt. 259, it was held that a conveyance from a husband to his wife, although inoperative in a court of law, would be upheld in a court of equity against a collateral relative of the husband. The deed was intended by the husband as a present transfer of all his interest as complete as he could make it, and would have passed the estate but for the technical rule of the common law, which forbids a conveyance by the husband to his wife.

Judge Allen, in delivering the opinion of the court, was careful to say that the relief sought was not against the grantor himself or a subsequent purchaser, or one standing in the relation of a wife or child, but a collateral relation, the nephew of the grantor.

That case was followed by *Sayers* v. *Wall*, 26 Gratt. 354, in which it was held that a deed from a husband to his wife, would be supported against subsequent creditors who had constructive notice of the conveyance. It is only necessary to refer to the opinion of Judge Anderson, which contains an elaborate discussion of the principles of law governing in such cases.

In *Burkholder* v. *Ludlam*, 30 Grattan, 255, this court decreed a specific execution as against creditors, because the donee, induced by the promise of his father-in-law, had altered his condition and made expenditures of money in valuable improvements on the land. In that case Judge Burks, in delivering his opinion, took occasion to say that a court of equity will not lend its aid to carry into execution contracts or agreements based wholly on a meritorious consideration.

This remark, although not called for by anything in the case then under consideration, is fully sustained by the current of authorities, certainly so far as they relate to

suits for specific execution against the grantor himself, or other persons having equally meritorious claims with the party applying for relief. In England the doctrine seems to be well settled that a promise made without a valuable consideration in favor of a child will not be enforced against the promisor himself, or against any one in whose favor he has altered his intention, or against a child for whom no provision has been made. Adams Equity, p. 98; 1 Perry on Trusts, §§ 107, 108.

The doctrine laid down by Lord Chancellor Snyden, in Ellis and Nimmo, L. & G., 333, was afterwards abandoned by him in *Moore* v. *Crofton*, 3 Jones & Lat. 442, and has been long since overruled by the later English cases.

In this country there is a considerable conflict of opinion on the subject. The books containing the adjudged cases are not to be found in the library at this place. It would seem that in some of the States the English rule has been followed; in others it has been repudiated. Mr. Justice Story, in the first volume of his Equity Jurisprudence, § 372, uses the following language : " It has been said that a postnuptial voluntary agreement by a father to make a provision for a child, will be specifically enforced in equity as founded in moral duty. But this doctrine, although it has the support of highly respectable authorities, seems now entirely overthrown." See also §§ 433, 793, 987; Bishpam's Principles of Equity, 108, 430.

The opinion of Judge Story is not merely sustained by the great weight of authority, but by the soundest considerations of justice and reason.

It is after the death of the parent that the meritorious consideration becomes such a powerful plea in a court of equity. The child has then lost the personal support of the parent, and therefore it is that the courts in such cases incline to execute a covenant in favor of a child. But it will never do so when the effect will be to leave other chil-

dren wholly unprovided for. In this case, if the appellee were dead, leaving some of his children without portions, this court would not against them decree the execution of this contract, because these children stand upon grounds equally meritorious with the appellants. Have these appellants, or any of the children, stronger claims upon a court of equity than the appellee, their father? I admit that if a son, influenced by the promise of his parent, puts valuable improvements upon the property, or foregoes the means of advancement in the world, or otherwise sustains loss or damage, a very different case would be presented. But I wish to know if a parent, having, as he supposes, ample means to advance his children, puts a son in possession of a tract of land, with a promise, verbal or written, to make him a deed, and the son pays nothing and loses nothing, is the parent cut off entirely from the *locus penitentia?* Is he bound to make good his promise, whatever may have been the change in his circumstances? If his property is diminished in value, or destroyed by fire or tempest, or if he be overtaken by debts which sweep away his estate, will a court of equity compel him to impoverish himself for the purpose of enriching his son?

One of the strongest holds which the parent has upon the fidelity and attentions of his children is through the instrumentality of his property, thus enforcing an obedience which filial affection does not always render.

Not unfrequently the parent finds that his confidence in his child has been misplaced—that the latter, from his dissipated habits or propensity for wild and reckless speculation, is unfit to be trusted with the control and management of property. To compel him, under such circumstances, to execute the gift, is to take from the parent the power of making such disposition of the estate as will secure the good conduct and promote the interests of the child.

It is not a matter of surprise that this doctrine of merito-

rious consideration has never found favor in the courts of equity, and, as has been well said by Judge Story, must be deemed now overthrown by the weight of more recent adjudications.    1 Story E. J., § 433.

I cannot better conclude this opinion than with an extract from an able article on the subject in Lewin on Trusts, page 95 :

"It is clear," says this author, "that an agreement founded on meritorious consideration will not be executed as against the settler himself. *Antrobus* v. *Smith*, 12 Vesey, 39.    Indeed, relief in such case would offend against the security of property.    If a man imprudently binds himself by a complete alienation, the court will not unloose the fetters he hath put upon himself, but he must lie down under his own folly.    *Villers* v. *Beaumont*, 1 Vernon, 100.    But if the court interpose where the act is left incomplete, what is it but to wrest property from a person who has not legally parted with it.    Again, if the imperfect gift can be enforced against the settlor himself, then the equitable right must form a lien upon the property, and upon the death of the settlor his heir would in all events be bound to convey, but even in aiding the defective execution of powers and supplying surrender of copyholds, a previous inquiry by the master is invariably directed, whether the heir of the settlor has any other adequate provision."

For these reasons I am for affirming the decree of the circuit court.

DECREE AFFIRMED.